IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| STEVEN J. SHAPIRO, | * |
| Plaintiff, | * |
| v. | *   Civil Action No. MJG-02-3931 |
| RAY T. BERRY, *et al.*, | * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* o0o \* \* \* \* \* \* \* \* \*

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
MOTION TO BIFURCATE LIABILITY FROM DAMAGES
AND STAY DAMAGES DISCOVERY**

Defendants, by and through their undersigned counsel, respectfully submit this Reply Memorandum in support of the Motion to Bifurcate Liability from Damages and Stay Damages Discovery. Bifurcating in some fashion the question of liability from "damages" makes incredible common sense in the individual circumstances of this case. Not only is plaintiff's "verbal contract" claim speculative to begin with, but several recently disclosed documents reveal (1) that without question the alleged contract would be unethical or illegal (*see* Section B, *infra*, at pages 4 - 10), and (2) that plaintiff has made a series of representations to his federal agency that are flatly contrary to the allegations he is making in this lawsuit (*see* Section C, *infra*, at pages 10 - 12). Under these circumstances, the Court should spare defendants the expense and invasiveness of "damages" discovery until certain critical issues relating to liability are established.

**A.    Introduction.**

It is "the overarching mandate of the Federal Rules of Civil Procedure that the rules 'shall be construed to secure the just, speedy, and inexpensive determination of every action.'"

*Fobian v. Storage Tech. Corp.*, 164 F. 3d 887, 891 (4th Cir. 1999), quoting Rule 1, Fed.R.Civ.P. *See also Boyd v. Univ. of Md. Med. Sys.*, 173 F.R.D. 143, 146 (D. Md. 1997) (Grimm, M.J.) (same, with respect to Local Discovery Guidelines).  It was in an effort to secure precisely such a result that defendants moved to bifurcate the question of liability from damages and to stay damages discovery pending a determination that plaintiff is entitled to the extraordinary result he seeks.

Notwithstanding plaintiffs hysterical response, this is a case in which it would really balance the parties' competing interests to bifurcate liability from damages in some fashion. Plaintiff cannot deny that the nature of his claims in this case are such that the question of whether he is entitled to relief, as opposed to the nature and amount of relief to which he would be entitled if he succeeds on the first question, are largely distinct, overlapping very little.  It is also apparent that the discovery he seeks is broad and invasive – particularly as concerns the business and financial data.

Unlike, say, a typical tort action, in which damages are themselves an element of the plaintiff's *prima facie* case, if plaintiff is successful in proving his claim to half of BHCMS, he will be entitled to prevail without proving what BHCMS is worth.  There will come a time when he will need to do so, of course, but that is why the law provides for an "accounting" in such circumstances, and as defendants pointed out in their principal Memorandum, at 8, that is precisely the relief plaintiff has prayed.  *See* Count I (Breach of Contract) and Count II (Declaratory Judgment) prayers for relief and Count VI (Accounting).  Unfortunately, plaintiff seeks – understandably – to have his dessert first, and upon being asked to wait, throws an admirable tantrum.

Under these circumstances, and given the time and expense that will be involved in producing the detailed information that plaintiff claims to need, defendants ask this Court to exercise its sound discretion by temporarily limiting the nature of the discovery in which the parties engage. The heart of this case is whether there was an agreement between the parties making the plaintiff a 50% owner of the defendant corporation. To prove there was such an agreement, plaintiff shouldn't need to fish through all of defendants' files to prove it.

Not only does this Court have the inherent authority to grant defendants' motion, but there is authority in this District for the relief defendants seek. *See* authorities cited in principal Memorandum at 6-8. While plaintiff cites authority to the contrary, the bottom line is, as this Court wrote in the case cited by plaintiff, "[t]he Court has broad discretion is deciding whether to bifurcate claims . . . ." *Wright Manuf., Inc. v. Great Dane Power Equipment, Inc.*, 1998 U.S. Dist. LEXIS 19484, *9 (D. Md. 1998) (Chasanow, J.). It would make enormous sense to do it here.[1]

Plaintiff charges that this Motion is "an obvious tactical ploy adopted well into the litigation," Def. Mem. at 7, citing *Wright Manufacturing* for support. But unlike *Wright*

---

[1] There are a number of possible ways to structure pretrial proceedings in this case that would balance plaintiff's need to obtain the discovery he legitimately needs to prove liability, yet shields defendants from the initial burden, expense, and oppression of a detailed inquiry into their business affairs by a potential competitor who may well have no enforceable contractual rights. One alternative, for example, would be for the Court to limit damages discovery pending summary judgment briefing on the issue of liability. Only when – and if – plaintiff is successful in generating a genuine issue of material fact on the question of whether he had an enforceable contract, would he be entitled to discover defendants business and financial information.

*Manufacturing*, this Motion was filed relatively early in the discovery process, before *any* depositions have been taken.[2]

Plaintiff's claim that the Confidentiality Order adequately protects defendants' interests is belied by the fact that no order can spare defendants the burden and expense of divulging sensitive financial and business data, let alone to a current or potential competitor such as the plaintiff. Although plaintiff represents in his Memorandum that he is not a competitor, unlike Mr. Berry, who submitted a sworn affidavit, he has not submitted an affidavit countering Mr. Berry's.[3]

**B.       The agreement alleged by plaintiff would be unethical or illegal.**

It is extremely tempting to be drawn in to a point-by-point rebuttal of plaintiff's factual arguments, but defendants will limit themselves to only two. The first is plaintiff's remarkable claim that there is nothing improper about his attempting to profit from BHCMS' activities, even though plaintiff's own agency funds much of BHCMS's work.

---

[2]With respect to Shapiro's claim that this matter has been pending for four months and defendants' response has been a "complete stonewalling," Def. Mem. at 1, undersigned defense counsel notes that he substituted his appearance for prior counsel on March 19, 2003. Answers to plaintiff's interrogatories and production of documents pursuant to this Requests for Production were served on plaintiff's counsel on March 28 – less than ten days later. On April 18, 2003, the parties and counsel attended a mediation with Magistrate Judge Connelly. It was unsuccessful, however, and the very next week defendants filed this Motion to Bifurcate and Stay Damages Discovery.

[3]Plaintiff simply takes issue with the fact that Berry's Affidavit was on "personal knowledge, information, and belief," rather than on personal knowledge alone, claiming without authority that this is inadequate. *See* Def. Mem. at 10. Other than Rule 56, Fed.R.Civ.P., however, dealing with motions for summary judgment, there is no requirement that pretrial affidavits be based solely on an affiant's personal knowledge. Even in trial, moreover, courts may based rulings on evidence that is not strictly admissible. *See* Rule 104(a), Fed.R.Evid. There certainly is no impediment to the Court considering Mr. Berry's sworn affidavit in ruling on this Motion.

Defendants have never denied that several years ago, when the plaintiff anticipated leaving his government job, he and Berry had discussions about forming a company, and that subsequently, plaintiff performed consulting services for BHCMS, services for which he has been paid quite well. As BHCMS put it in its sworn answers to plaintiff's interrogatories (the interrogatories that Mr. Shapiro claims defendants have "completely stonewalled"[4]):

> Sometime in 2000, plaintiff informed Ray Berry that plaintiff believed he was about to be terminated from his position with the United States Department of Health and Human Services and suggested that upon his leaving the government he and Berry should join with several other individuals to form a company named Social Systems Information Solutions ("SISS") whose purpose would be to develop software to market to state and local criminal justice agencies. To investigate the feasability of forming such a company – including the willingness of certain critical individuals to leave their existing positions and join the new venture – Berry incurred substantial costs, costs which were borne by Berry's company, Behavioral Health Care Management Systems, Inc. ("BHCMS"). To induce Berry to continue his efforts, plaintiff agreed to reimburse BHCMS for a portion of those and future costs. The check was deposited into BHCMS' account on or about June 21, 2000. Shortly thereafter, however, a meeting was held with the individuals whose participation was considered critical to the new venture and it became apparent that the proposed company that plaintiff and Berry had discussed was not viable because, *inter alia*, those individuals were not prepared to leave their current positions.

BHCMS' Answer to Plaintiff's Interrogatory No. 15 (Exhibit A). In addition to the fact that the parties never consummated an agreement, it never occurred to defendants that Shapiro would assume that he could be a partner in this venture *while still employed by the federal government*.

Shapiro, however, claims that "there is nothing illegal or improper in such an arrangement, and defendants cannot cite any legal authority to the contrary," Def. Mem. at 3. For example, plaintiff claims an interest in a contract he identifies as involving "Orange County, Florida." *See* Def. Mem. at 4. That contract, however, as plaintiff must know, is funded in large part by his very own agency, the Substance Abuse and Mental Health Services Administration

---

[4]Def. Mem. at 1.

("SAMHSA") of the United States Department of Health and Human Services ("HHS").  *See* SAMHSA Guidance for Applicants, GFA No. SM00-011, issued July, 2000, Exhibit B ("Florida grant").

Why must he know about it?  Because Exhibit B was produced by plaintiff himself from his own files.  Moreover, he has had a series of direct communications with Pat Shea, the SAMHSA grant officer with direct responsibility for the contract, *a colleague of his at SAMHSA*.  On March 7, 2001, for example, three to four months before the Florida grant was publicly issued, plaintiff ("SShapiro@samhsa.gov") used his government e-mail to send a message to Shea ("PSHEA@samhsa.gov") extolling the virtues of a computer program marketed by a Sysinct, a division of IKON Business Systems, offering to assist Shea "in any way I can":

> Pat:
>
> It was nice to finally meet you in person.  *The Florida grantees are lucky to have such a great and caring Federal project officer!*
>
> Please *feel free to call or e-mail me if you have any questions after you review the materials I gave you*.  I can obtain more CD demonstration discs if you like.
>
> I hope you will feel like Montgomery County that this is by far the leading IT platform in the country to build a Youth & Juvenile Information system.  The beauty of the system is that it can be adapted to each location whether their current information systems are lacking or are advanced as well as implement the common data elements which you explained in all the sites.
>
> I can give you the contact information for the county official at each location (Montgomery, Lane, and Travis) for references.  Also, if you would like I can arrange with the Sysinct technical staff, who have just relocated here.
>
> *Please feel free to call as [sic] me as a resource person on any part of the project as I have worked extensively in this area the past five years.  I will be glad to help and assist you in any way I can.*
>
> With best regards.
>
> Steve

6

Exhibit C (emphasis added). It is BHCMS' participation in this very contract to which plaintiff now claims he is entitled to 50% of the gross profits! Several months later, plaintiff apparently sent Mr. Shea another e-mail, this one with the subject "Help please." See October 11, 2000 e-mail from Pat Shea to plaintiff (Exhibit D).

Not only is there no indication in any of these documents that plaintiff disclosed to Shea his personal interest in this contract (or even that he was working as a consultant with a potential grant applicant), but to the contrary, there is evidence that plaintiff has actively misrepresented his role. In Answers to Interrogatories, plaintiff swears that "[a] conservative calculation of the time that I spent on behalf of BHCMSI from approximately January 2000 to the present is 1,000 hours." Plaintiff's Answer to BHCMS Interrogatory No. 13 (Exhibit E). On March 25, 2003, however, plaintiff filed a Request for Approval of Outside Activity in which he estimated that the total time he would spend from January 1, 2002 to December 1, 2006" – a five year period – would only be "12 days," all of which would be "performed entirely outside usual working hours." See Exhibit F at Boxes 8 (a) - (c).

Exhibit F is interesting for a variety of other reasons. In answer to Question 9, "Do your official duties relate in any way to the proposed activity? plaintiff stated "NO". Id. This is an odd statement given plaintiff's claim above as to the value he allegedly brought to BHCMS ("While with HHS, Mr. Shapiro has gained considerable knowledge and expertise in the fields of health, substance abuse, and drug education and treatment, computer information systems, and related research and development, and in the provision of related services through state, county, and municipal governments and other non-profit, private entities." Def. Mem. at 2-3).

In answer to Question 10, "If providing consultative or professional services, do your would-be associates receive or will they seek, a grant or contract from a federal agency?" and Question 12, "Will compensation be derived from a HHS grant or contract?" plaintiff again states "NO". This is equally odd given the facts of the Florida grant.[5] These statements, taken together, make clear that the arrangement plaintiff claims to have had with defendants, if true, would be improper and/or illegal.

As for plaintiff's claim that "there is nothing illegal or improper in such an arrangement, and defendants cannot cite any legal authority to the contrary," Def. Mem. at 3. HHS regulations make it clear that this is grossly illegal. The Standards of Ethical Conduct for Employees of the Department of Health and Human Services, for example, codified at 5 C.F.R. 5501[6] provides, *inter alia*:

> Sec. 5501.106  Outside employment and other outside activities.
> \* \* \*
> (c) Prohibited outside employment and activities–
>
> (1) Prohibited assistance in the preparation of grant applications or contract proposals. An employee shall not provide consultative or professional services, for compensation, to or on behalf of any other person to prepare, or assist in the preparation of, any grant application, contract proposal, program report, or other document intended for submission to HHS.

---

[5]Immediately below Question 10, the form contains the following language: "Services provided will not knowingly involve, directly or indirectly, preparation material which could relate to any financial dealings between the outside organization and [strike-out]." What is underneath the strike-out cannot be read, however someone (presumably the plaintiff) has handwritten "SAMHSA".

[6]Links to the various standards of ethical conduct covering HHS employees, including the "HHS Residual Standards of Conduct," 45 C.F.R. Part 73, and "Supplemental Standards of Conduct for Employees of the Department of Health and Human Services," 5 C.F.R. Part 5501, are collected at http://ethics.od.nih.gov/lawreg/hhs-std.htm.

> (2) Prohibited employment in HHS-funded activities. An employee shall not, for compensation, engage in employment, as defined in 5 C.F.R. 2635.603(a), with respect to a particular activity funded by an HHS grant, contract, cooperative agreement, cooperative research and development agreement, or other funding mechanism authorized by statute.

This is precisely what Shapiro claims his contribution to BHCMS was. For example, in his 1memorandum he states:

> Mr. Shapiro works for the Department of Health and Human Services. While with HHS, Mr. Shapiro has gained considerable knowledge and expertise in the fields of health, substance abuse, and drug education and treatment, computer information systems, and related research and development, and in the provision of related services through state, county, and municipal governments and other non-profit, private entities. Mr. Shapiro has specific *knowledge*, expertise, and *contacts* that defendants did not have.

Def. Mem. at 2-3 (emphasis added; citations to the record omitted). This conduct is wildly improper, if not criminal.

Appendix A to the HHS Standards of Conduct sets forth a "List of Some Offenses for Which Disciplinary Action May Be Taken. Included are:

> C. Concerning Conflicts of Interest and Related Unethical Conduct:
>
> 1. Violations of 18 U.S.C. Chapter 11: Bribery, Graft, and Conflicts of Interest, including:
>
>    a. Having a direct or indirect financial interest (includes employee ownership of stocks, bonds, or partnership interests in an entity or employment of the employee, his or her spouse, or dependent child) that conflicts with one's Government duties because such entity is either regulated by, has *or seeks to do business with the agency, or has any other particular matter with or pending before the agency* that may give rise to either an actual conflict or the appearance thereof. (18 U.S.C. 208.)

9

> \* \* \* \*
> 2. Engaging, directly or indirectly, in a financial transaction as a result of or *primarily relying on information that is obtained through one's official duties and would not be available were the employee not an employee of the Federal Government.*

(Emphasis added).

Plaintiff appears to be trading off of knowledge and relationships that he has as a government employee for his own financial gain. This cannot possible be legal (or if it is, we are all in the wrong business). If it were as innocent as plaintiff maintains in submissions to this Court, surely he would have been more forthcoming about the nature of his activities with his employer.

**C.   Plaintiff's claims in this lawsuit are directly contrary to numerous representations he has made to his federal employer.**

In addition to the ethical issues raised by plaintiff's sworn statements to SAMHSA, there are several statements on Exhibit F and an e-mail between plaintiff and the SAMHSA Human Resources Office (Exhibit G) that flatly contradict plaintiff's substantive contract claim. Plaintiff makes much of the fact, for example, that he received $50,000 last year, claiming that it represented a partial payment to him of his share of BHCMS' "gross profits," and is evidence of the "contract" between him and Berry entitling him to a 50% equity stake in BHCMS. *See*, *e.g.*, Def. Mem. at 4-5 ("Funds in these amounts do not change hands without any legal significance. Obviously, the payments to Mr. Shapiro . . . are evidence of the contract."); and 11 ("The fact that BHCMSI made payments to Mr. Shapiro out of the 'gross profits' of BHCMSI is consistent with Mr. Shapiro's allegations in this case.").

BHCMS, on the other hand, has consistently maintained that the payments to plaintiff were for consulting work plaintiff allegedly did in connection with the Montgomery

10

County/University of Maryland contract. Exhibits F and G firmly support BHCMS's version that there was no contract between the parties, and that any payments to the plaintiff were for consulting services..

In Box 5 of Exhibit F, for example, seeking "Name, Address and Business of Person or Organization for Whom Outside Services Will be Performed," plaintiff stated "To be determined." This is an odd answer given plaintiff's claim in this litigation that well before March 25, 2002 he had a binding contract to be a 50% owner of BHCMS. Surely, if that was the case, he was obligated to disclose BHCMS' identity, rather than state "To be determined."

In answer to Box 7 of Exhibit F, which asks for the "Nature of Activity," plaintiff answers: "*Consulting* on web-based information sharing technologies . . ." (Emphasis added). Similarly, Box 11 of Exhibit F seeks the "Method or basis of compensation." There are six choices: "Honorarium", "Fee", "Royalty", "Expenses", or "Other (specify)." *Id.* Plaintiff has checked the boxes next to "Fee" and "Expenses". In view of his claim in this litigation that he is a 50% owner of BHCMS and entitled to 50% of its "gross profits" – and, moreover, that the payments to him were in the nature of a profit distribution rather than a consulting fee – it seems more than odd that he only check "Fee" and "Expenses." It seems, in fact, flatly inconsistent with the claims he is making in this lawsuit.

This is, however, *consistent* with a representation that plaintiff made approximately a year later in an e-mail to Bill Gualtieri, from SAMHSA's Human Resources division. In that e-mail plaintiff represented:

> Per our telephone conversation law week, I appreciate the opportunity to further clarify my relationship with Ray Berry and his florida-based firm, Behavioral Healthcare [sic] Management Systems (BHCMS). . . .
>
> As I explained, last year (2002) was the first year in which I listed this relationship on Form 450, simply because 2002 was first year [sic] in which there was financial

11

>compensation from Mr. Berry to me for *consulting services*. There has *never been a formal agreement between us, although I have pursued one*. As a precursor to my *consulting services*, I had initial conversations beginning in 1999 with Mr. Berry on the efficacy of providing such services, and provided him financial backing in 2000 to pursue these.[7] Mr. Berry and I had a couple of *exploratory consultations* to develop and provide these services with one entity in particular, Montgomery County, MD in association with the University of Maryland. There was absolutely no HHS funding involved, nor was there any relationship between these discussions and my professional obligations with SAMHSA.

Exhibit G (emphasis added). The following day, March 25, 2003, Mr. Gualtieri responded "BTW, even uncompensated outside activities can potentially cause a conflict of interest, although it appears from your explanation that none exists at this point." *Id.* It is safe to assume that Mr. Gualtieri is not familiar with the claims plaintiff is making in this lawsuit.

**D.   Conclusion.**

Plaintiff has shrewdly calculated that thin and improper as his "verbal contract" claim may be, if he can make life difficult and inconvenient enough for defendants, they will choose to settle with him. This Court should not countenance such a strategy. There is a common sense alternative that is fair, and reasonable, and that serves the interests of both plaintiff and defendants in this matter: simply require plaintiff to demonstrate the validity of his contract claim before allowing the equivalent of post-judgment discovery.

---

[7]This is a reference to the $5,000 that – in this lawsuit – plaintiff claims was an equity contribution. The contrary characterization in Exhibit F, however, is virtually identical to BHCMS' description of it as reimbursement for the expenses Mr. Berry incurred traveling around the country to attempt (unsuccessfully) to recruit individuals to the proposed venture (a description which was made prior to plaintiff's production of Exhibit G). *See* BHCMS Answer to Interrogatory No. 15, *supra* ("To investigate the feasability of forming such a company – including the willingness of certain critical individuals to leave their existing positions and join the new venture – Berry incurred substantial costs, costs which were borne by Berry's company, Behavioral Health Care Management Systems, Inc. ('BHCMS'). To induce Berry to continue his efforts, plaintiff agreed to reimburse BHCMS for a portion of those and future costs.").

**WHEREFORE**, defendants pray that this Court grant their Motion to Bifurcate Liability from Damages and Stay Damages Discovery.

Respectfully submitted,

/s/
Andrew D. Levy
Staci J. Krupp
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
(410) 962-1030

Attorney for Defendants

Dated: May 28, 2003

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 28th day of May, 2003, a copy of the foregoing was electronically served on Vernon W. Johnson, III, Esquire, "vjohnson@jackscamp.com" and the exhibits and a hard copy of this Memorandum hand-delivered to:

Vernon W. Johnson, III, Esquire
Jackson & Campbell, P.C.
1120 20th Street, N.W.
South Tower
Washington, D.C. 20036

/s/
Andrew D. Levy